TIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RUSH UNIVERSITY MEDICAL CENTER, | ) |
| Plaintiff | ) |
| | ) No. 07 C 2859 |
| v. | ) |
| | ) The Honorable William J. Hibbler |
| MICHAEL O. LEAVITT, Secretary, | ) |
| Department of Health & Human Services | ) |
| Defendant. | ) |

MHN

## MEMORANDUM OPINION AND ORDER

Plaintiff Rush University Medical Center seeks judicial review of the Secretary of Health and Human Services' ("Secretary") final decision reversing in part and affirming in part a decision of the Provider Reimbursement Review Board (PRRB). Rush and the Secretary each move for summary judgment. For the reasons set forth below, the Court grants the Secretary's Motion and denies Rush's.

### I. Background

Medicare is a federally funded health insurance program for the elderly and disabled. 42 U.S.C. § 1395 *et seq.*. In establishing the program, Congress granted authority to the Secretary of Health and Human Services to issue regulations defining reimbursable costs. 42 U.S.C. § 1395x(v)(1)(A).

Rush University Medical Center, formerly known as Rush-Presbyterian-St. Luke's Medical Center, is a large, not-for-profit, certified Medicare-participating provider in Chicago, Illinois. (Administrative Record ("A.R.") at 55). Rush is also a teaching hospital, where residents train in

1

a number of specialties and subspecialties. (Id.). Medicare reimburses providers, such as Rush, for certain costs of covered services associated with the treatment of Medicare beneficiaries, including but not limited to, the direct and indirect costs of graduate medical education. 42 U.S.C. § 1395ww(h); 42 U.S.C. § 1395ww(d)(5)(B).

The Centers for Medicare and Medicaid Services ("CMS") administers the Medicare program at the designation of the Secretary. CMS engages private organizations to act as "fiscal intermediaries" to facilitate payments pursuant to Medicare regulations. *See* 42 U.S.C. § 1395h. Providers file annual hospital cost reports with fiscal intermediaries in order to obtain applicable benefits. *See* 42 C.F.R. § 413.20; 42 C.F.R. § 413.24(f). The fiscal intermediary audits the report and determines the amount to reimburse the provider.

If a provider disagree's with a fiscal intermediary's notice of program reimbursement, it may request an administrative hearing before the PRRB. 42 U.S.C.§ 1395500(a). The PRRB's decision serves as the final agency action unless the CMS Administrator timely reverses, affirms, or amends the decision. 42 U.S.C. § 139500(f)(1).

In September 1994, the Fiscal Intermediary issued its Notice of Program Reimbursement ("NPR") to Rush covering the cost reporting period from July 1, 1991 to June 30, 1992 ("FY 1992"). (A.R. 724-758). Rush appealed the Intermediary's adverse decision, arguing that the Intermediary erred in: 1) failing to include Rush's transplant surgery residents in the full-time equivalent ("FTE") count for purposes of both direct graduate medical education ("DGME") and indirect medical education ("IME") reimbursement; 2) in not granting reimbursement under Medicare Part B for the costs it incurred related to its transplant surgery residents pursuant to 42 C.F.R. § 405.523; 3) in failing to include all MedCare HMO days claimed by Rush in calculating Rush's disproportionate

2

share hospital ("DSH") payment and; 4) in disallowing a portion of the depreciation expense claimed for Rush's Atrium Pavilion. In January 2007, the PRRB found in favor of Rush on the second and fourth issues. The CMS then issued a decision adverse to Rush on all four issues.

A. Transplant Surgery Fellowship

Among the costs Medicare reimburses are those associated with graduate medical education programs that provide interns and residents clinical training in various medical specialties. Rush operates a two-year transplant surgery fellowship for which it sought reimbursement under Medicare.

Organ transplants in the United States are highly regulated. *See* National Organ Transplant Act of 1984, 42 U.S.C. §§ 201 *et seq.*, 273 *et seq.*; *see also* http://www.optn.org (last visited Sept. 4, 2008). The National Organ Transplant Act established the Organ Procurement and Transplant Network ("OPTN"), a unified, transparent network overseeing organ transplants in the United States. (A.R. at 104); http://www.optn.org (last visited Sep. 4, 2008). The United Network of Organ Sharing ("UNOS") is a private, non-profit organization that administers the OPTN and that, among other things, certifies and approves organ transplant services at hospitals. (A.R. at 104-5). UNOS relies on the American Society of Transplant Surgeons ("ASTS") to design programs for certification in various transplant surgeries. (A.R. at 105-06). Rush's two-year transplant surgery fellowship is accredited by the ASTS. (A.R. at 182, 187).

During FY 1992, four fellows participated in Rush's transplant surgery fellowship. Rush sought 1.54 FTEs in direct graduate medical education reimbursement and 3.07 FTEs in indirect medical education reimbursement. (A.R. at 57-58). The Intermediary disallowed these individuals

3

from both FTE counts because the Intermediary held they did not participate in an approved program pursuant to 42 C.F.R. § 413.86. (A.R. at 57-58).

When Rush submitted its cost report to the Fiscal Intermediary, it did not include Worksheet D-2 or seek reimbursement for the transplant surgery residents under Medicare Part B, 42 C.F.R. § 405.523 (1992). Instead, after the Fiscal Intermediary denied DGME & IME reimbursement for these residents, Rush asked the PRRB to review the Intermediary's determination and, in the alternative, allow it to submit a claim under Medicare Part B for the transplant surgery residents. (A.R. at 10-11). In 2007, the PRRB agreed with Rush that costs associated with the transplant surgery residents were reimbursable under § 405.523 and remanded the issue to the Intermediary to review Rush's cost data. (A.R. at 61). The Intermediary appealed the PRRB's decision to the Administrator. (A.R. 35-38).

Precisely what transpired during the twelve year period after the Intermediary issued the NPR and prior to the PRRB's decision is unclear. The administrative record contains numerous documents that suggest the parties attempted to resolve the disputed issues, including efforts to mediate the dispute. (A.R. at 552-571, 575-585, 715, 719-720). It is also clear that Rush did not complete Worksheet D-2 during the pendency of Rush's appeal of the Intermediary's NPR to the PRRB. (A.R. at 10-11, 36-37, 464).

B. Disproportionate Hospital Share

Medicare provides increased reimbursement to hospitals that serve a "significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). In support of its claim for increased reimbursement, Rush submitted the portion of the Illinois Department of Public Aid's ("IDPA") HMO report. (A.R. at 112, 286-287). The IDPA report identifies the length

4

of stay, admission date, and discharge date for unnamed patients. (A.R. at 286-287). Rush sought 172 days that it identified as MedCare HMO days in the FY 1992 cost reporting period. (A.R. at 419-420). IDPA complied the report from data submitted to it by Medcare HMO and other HMOs. (A.R. at 112-113, 294).

The Intermediary requested that Rush provide additional information. Specifically, the Intermediary asked Rush to match the dates of stay from the IDPA report to a patient's financial or medical files and to demonstrate the patient was eligible for Medicaid during the dates of the stay. (A.R. at 357). Rush hired a consultant, Thomas Curtis, to supplement the material it provided to the Intermediary. Curtis was able to "match" data from Rush to 39 of the 172 MedCare HMO days on the IDPA report. (A.R. at 112-117).

The Intermediary disallowed the remaining 133 MedCare HMO days based on insufficient documentation. The Intermediary noted that the IDPA report often includes duplicate entries for patients and includes patients who may not have been Medicaid eligible. (A.R. at 294). Curtis testified during a deposition that the IDPA often understates the number of HMO days. (A.R. at 115-117). Curtis also testified that during the matching process, he never encountered a false positive; that is, he never uncovered a person on the IDPA list who was not eligible for Medicaid. (A.R. at 114).

Despite Curtis's testimony, the CMS Administrator disallowed the 139 days for which Rush could not provide documentary evidence identifying the patient name or proof that the patient was eligible for Medicaid, stating that Rush had not met its evidentiary burden.

C. The Atrium Pavilion

5

In 1982 Rush improved its main hospital building's "Atrium Pavilion." Rush placed the Atrium Pavilion assets in service in fiscal year 1982 at an original cost of approximately $58,000,000. (A.R. at 144). Rush assigned the Pavilion a forty year depreciable life, making it fully depreciated during FY 2022. (A.R. at 124). In 1984, Rush changed the method of computing the Pavilion's depreciation, placing it on a ten year depreciable life and making it fully depreciated during FY 1992. (A.R. at 120, 299).

In FY 1992, Rush discovered a balance of $300,783 remaining in the Pavilion depreciation account. (A.R. at 121, 145). Rush sought to claim the balance on its FY 1992 cost report in addition to the scheduled depreciation amount. (A.R. at 156). The Intermediary did not allow the additional amount on the grounds that Rush had neither provided documentation to demonstrate the additional claim was attributable to FY 1992 nor moved to reopen a prior cost reporting period. (A.R. at 156).

The PRRB found that, although the Intermediary was technically correct in disallowing the additional depreciation, the Intermediary should have allowed a multi-year adjustment for the single cost reporting period of FY 1992. (A.R. at 3). The Administrator reversed the PRRB's decision, noting that there was "no authority to allow the payment of costs relating to an earlier cost year in the FYE 1992 cost year." (A.R. at 13).

### III. Standard of Review

The Social Security Act, of which the Medicare program is part, incorporates the Administrative Procedure Act ("APA"), *see* 42 U.S.C. § 1395oo(f)(1), which commands reviewing courts to uphold agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E); *see also Paragon Health Network, Inc. v. Thompson*, 251 F.3d 1141, 1145 (7th Cir. 2001). This

deliberately narrow standard of review requires courts to give substantial deference to an agency's interpretation of its own regulations. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 513, 114 S. Ct. 2381, 2386, 129 L.Ed.2d 405 (1994).

A court's task is not to decide "which among several competing interpretations best serves the regulatory purpose," but to give the agency's interpretation "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.* (internal quotations omitted). The Supreme Court has noted such broad deference is particularly warranted where the regulation concerns "'a complex and highly technical regulatory program' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Id.*, 114 S.Ct. at 2387 (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697, 111 S.Ct. 1514, 1534, 115 L.Ed 2d 604 (1991)).

Moreover, courts may not reweigh evidence and instead limit their inquiries to whether substantial evidence supports an agency decision. *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

IV. Analysis

A.  Transplant Surgery Fellowship

As noted earlier, Medicare reimburses hospitals for both DGME and IME costs. 42 U.S.C. § 1395ww(h); 42 U.S.C. § 1395ww(d)(5)(B). For the FY 1992 cost reporting period, medicare pays DGME costs for interns and residents in "approved programs" in accordance with 42 C.F.R. § 413.86 (1992). *See* 42 C.F.R. § 412.113(b)(2) (1992). The regulation defines an "approved

7

medical residency program" as one that: (1) is approved by one of the national organizations listed in § 405.522(a); (2) may count towards certification in a specialty or subspecialty listed in the Directory of Graduate Medical Education Programs published by the AMA or the Annual Report and Reference Handbook published by the American Board of Medical Specialties; or (3) is approved by the Accreditation Council for Graduate Medical Education (ACGME) as a fellowship program in geriatric medicine. 42 C.F.R. § 413.86(b) (1992).

The implementing regulation to calculate a hospital's IME costs contains similar requirements. To receive payment for IME costs associated with interns and residents, the participating residents must be enrolled in an approved teaching program. 42 C.F.R. § 412.105(g) (1992). The program must be one that: (1) is approved by one of the national organizations listed in § 405.522(a); (2) may count towards certification in a specialty or subspecialty listed in the Directory of Residency Training Programs published by the AMA; or (3) is approved by the ACGME as a fellowship in geriatric medicine. 42 C.F.R. § 412.105(g) (1992).

In its decision, the CMS Administrator recognized the implementing regulation that defines approved medical residency programs and the statutory authority that provides its basis. (A.R. at 6-7). The Administrator commented that Rush conceded that the American Society of Transplant Surgeons approved the transplant surgery fellowship program and that it is not a body listed in the applicable regulations. *See* 42 C.F.R. § 405.522 (1992); (A.R. at 7). The Administrator further observed that none of the publications identified by the implementing regulations listed transplant surgery as a specialty or subspecialty. (A.R. at 7). Accordingly, the Administrator found that the Board did not err in excluding the costs of Rush's transplant surgery program in the DGME and IME calculations. (A.R. at 7-8).

8

Rush argues that it is unreasonable for the Secretary to rely exclusively on the AMA Directory and ABMS Handbook to provide the list of subspecialties that meet the definition of an "approved program." In constructing its argument, Rush relies heavily on the preamble to the 1989 version of the implementing regulation. In implementing the 1989 version of the regulation, the Secretary noted that problems existed in identifying which fellowship programs in certain medical subspecialties should be included in the list of approved programs for purposes of DGME and IME. *See* 54 Fed. Reg. 40286, 40295 (Sept. 29, 1989). The Secretary notes in the preamble that "[t]he Medicare program has generally treated fellowship programs as if they were accredited and paid for the services of residents in these programs as residents in approved programs." *Id.* This language, Rush suggests, reveals the intent of the Secretary to "include all legitimate fellowship programs under the umbrella of 'approved medical residency programs.'" (Pl. Mem. In Support of Summary Judgment at 14). Rush suggests therefore that even if a program falls outside the scope of an "approved" program according to the implementing regulation, it nonetheless should be considered an approved program if it meets the intent of the statute. Rush contends such an approach is necessary to keep pace with the ever-evolving training programs and the advancement of medical knowledge. Rush also argues its transplant surgery fellowship should be considered an approved program because the certification requirements imposed by UNOS are more stringent than those of many programs listed in ACGME.

Rush's arguments are not convincing. The very fact that medicine is a fluid and evolving field dictates that the Secretary must employ some mechanism to catalog and identify which teaching programs qualify as "approved programs." Rush makes no argument that the AMA Directory or the ABMS Handbook are not reliable or informed sources. Rush merely suggests that

9

the Secretary should have, in addition, provided for the exercise of discretion in determining which programs meet the regulatory definition. In short, Rush would have the Court find that the Secretary should engage in a two-part analysis of whether a program is an "approved program," first applying the implementing regulation and then making a case-by-case determination of whether a fellowship program constituted an "approved" program according to the intent of the statute. The Seventh Circuit has already rejected this approach. *Rush v. Leavitt*, 535 F.3d 735, at * 5 (7th Cir. 2008) (noting that while the Secretary, perhaps, "could make exceptions on grounds such as these, . . . it is not arbitrary to enforce the rules as written).

The preamble on which Rush bases much of its argument itself reveals that the Secretary was well aware of the problem in identifying which teaching programs should be approved in a fluid and highly technical field. *See* 54 Fed. Reg. 40286, 40295 (Sep. 29, 1989). Despite this understanding, however, the Secretary implemented regulations that did not call for the exercise of discretion when a teaching program might fall outside the criteria established by the regulation. Instead, the Secretary noted that providers could seek reimbursement under Medicare Part B for residents who did not meet the regulatory definition of an approved program under Medicare Part B. *See* 54 Fed. Reg. 40286, 40295 (Sep. 29, 1989) (referring to 42 C.F.R. § 405.523 (1991)). Medicare is a complex program and "would not be administrable if the Secretary had to bend or break rules whenever a judge thinks that something outside the rule is 'close enough' to a rule's spirt." *See Rush v. Leavitt*, 535 F.3d 735, at *5.

Rush has offered no persuasive argument to demonstrate that the Secretary's decision to limit the definition of approved programs to those listed as specialties or subspecialties in two directories and to allow for other programs to seek reimbursement under Medicare Part B as unreasonable. The

Court will not substitute its own judgment in place of the regulatory scheme created by the Secretary.

Rush also argues that the Secretary, in the past, has ignored the regulatory scheme and found that programs that were not listed in any of the resources referenced in § 413.86 nonetheless met the regulatory definition of an approved program. In support, Rush points to *Ellis Hospital v. Blue Cross and Blue Shield Ass'n* (HCFA Administrator Dec. Mar. 30, 1998) (A.R. at 326-341). The decision in *Ellis Hospital*, however, does not stand for the proposition that any program that offers certification in a subspecialty meets the regulatory definition of an approved program.

In *Ellis Hospital*, the Administrator discussed the problem identifying sub-specialty programs that included fellows, as opposed to residents. (A.R. at 334). *Ellis Hospital* quoted the preamble cited by Rush in emphasizing that for the purpose of determining what constitutes an approved program, the emphasis is not the program's accreditation, but the acceptability of training for the purpose of attaining certification in a specialty or sub-specialty. (A.R. at 334). The Administrator observed that the Critical Care Fellowship at issue in *Ellis Hospital* was not accredited by any of the designated approving bodies, but that it did offer a certification in a subspecialty listed in the ABMS Handbook. (A.R. at 336). Unlike that decision, the subspecialty of transplant surgery, at issue here, is not listed as a subspecialty in either the ABMS Handbook or the AMA Directory.

The Court holds that the Secretary's finding that Rush's transplant surgery fellowship is not an approved program under medicare is supported by substantial evidence and is neither arbitrary nor capricious.

Rush argues that in the event its transplant surgery fellowship does not constitute an approved program, the Secretary should have reimbursed it for the transplant surgery fellows under Medicare Part B. *See* 42 C.F.R. § 405.523. Medicare Part B allows providers to recover some costs for residents and interns who do not participate in an approved program. 42 C.F.R. § 405.523. Among other things, Medicare Part B requires that the provider submit auditable data to demonstrate that residents in non-approved programs timely billed for their services under Medicare Part B. *See* 42 C.F.R. § 405.523; § 413.20(a); § 413.24(a); (A.R. at 37, 39).

The Secretary contends that Rush has missed its chance to submit its claims for the transplant surgery residents under Medicare Part B. In support, the Secretary cites to the statute, the implementing regulations and caselaw that suggest the burden is on the provider to provide evidence to establish its claims. *See* Mem. in Support of Secretary's Cross-Motion for Sum. J. at 22) (citing *St. Mary of Nazareth Hosp. Ctr. v. Shalala*, 96 F. Supp. 2d 773, 779 (N.D. Ill. 2000); *Mercy Home Health v. Leavitt*, 436 F.3d 370, 380 (7h Cir. 2006); 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.24(a)). The Secretary argues that if Rush is allowed to submit its costs under Medicare Part B after it has pursued administrative and judicial review undermines the finality of its administrative decisions and subjects the Secretary to increased litigation costs. Such a piecemeal appellate process wastes judicial and administrative resources. Therefore, the Secretary contends, its decision to deny Rush the opportunity to submit its costs for the transplant surgery program under Medicare Part B was not unreasonable, arbitrary, or capricious.

Rush argues that the Secretary's position would have required it (and other providers) to submit documentation under competing theories of reimbursement in order to preserve the opportunity to recover Medicare costs. Such a position, Rush contends, would result in duplicative

cost submission that would increase both the Secretary's and the providers' administrative costs and create the risk of overlapping reimbursements or potential overpayments. The alternative, Rush suggests, would be to force providers to choose at the outset of the cost reporting period whether to pursue reimbursement for a fellowship program as an approved program or under Medicare Part B.

Although one Court in this District has held that a provider should be able to pursue an alternative claim that it did not present to the fiscal intermediary, *see Rush Univ. Med. Ctr. v. Leavitt*, 06 C 1550, 2007 U.S. Dist. Lexis 66244 (N.D. Ill. Sep. 4, 2007), the Seventh Circuit has spoken to the contrary on the matter (which, curiously, the Secretary fails to mention). In *Little Co. of Mary Hosp. v. Shalala*, the hospital pursued a colorable claim regarding a loss on the refunding of its debt. 165 F.3d 1162, 1165 (7th Cir. 1999). To pursue the debt claim, the hospital reduced its investment income to zero, which eliminated a smaller, alternative claim related to a land loss. *Id.*. As a result, the hospital chose not to pursue the land loss claim. *Id.* The intermediary denied debt claim, and a subsequent Supreme Court ruling doomed the hospital's appeal of the intermediary's decision. *Id.* The Hospital then sought to introduce the land loss claim to the review board, and the board ruled that it couldn't because it would entail "bypassing the fiscal intermediary." *Id.* On appeal, the Seventh Circuit held that the hospital could not pursue the alternative argument, noting that the intent of the statute is plain that "the provider must give the intermediary a first shot at the issue." *Id.*

Rush chose to pursue a claim for the transplant surgery fellows under Medicare Part A and never gave the Fiscal Intermediary the opportunity to review the alternative claim under Medicare Part B. Under the law of this circuit, it may not attempt to belatedly raise the alternative claim

before the PRRB, and therefore the Court holds that the Secretary's decision is not arbitrary or capricious.

B.     Disproportionate Hospital Share

Medicare allows an adjustment, known as the Disproportionate Hospital Share ("DHS"), to hospitals that serve a "significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). To calculate this adjustment, the agency employs a formula that is the sum of two fractions: the "Medicare fraction" and the "Medicaid fraction." 42 U.S.C. § 1395ww(d)(5)(F)(vi). The Medicaid fraction, at issue here, is the number of the hospital's patient days for patients eligible for Medicaid but not entitled to Medicare Part A divided by the hospital's total patient days. 42 U.S.C. § 1395ww(d)(5)(F)(vi); 42 C.F.R. § 412.106(b)(4).

The implementing regulations require providers to provide and maintain sufficient financial records and statistical data. 42 C.F.R. § 413.20(a) (1991); 42 C.F.R. § 413.24 (1991). Among other things, the data must be based on financial and statistical record and capable of verification by qualified auditors. 42 C.F.R. § 413.24. The burden of submitting adequate data rests with the provider. *Mercy Home Health v. Leavitt*, 436 F.3d 370, 380 (7th Cir. 2006).

Rush argues that it was unreasonable for the Secretary to refuse to rely upon the IDPA report to substantiate a number of MedCare HMO days as a portion of its total Medicaid patient days. Rush suggests that the IDPA receives its data from HMOs that paid claims for Medicaid beneficiaries, and thus those patients listed on the report, though not listed by name, are Medicaid eligible patients. Rush also points to the testimony of its consultant who testified that if anything the IDPA understates the number of Medicaid days that Rush could claim. Finally, Rush argues that the consultant "matched" many of the patients listed on the report to Rush's medical records and

14

because this sampling process produced no false errors, the Secretary should not have discredited the report.

The Secretary puts forth a different view of the evidence. First, the Secretary points out that Rush's consultant did not perform a true sample. That is, he did not randomly select 30 listings from the IDPA report to verify. He instead attempted to match as many listings as he could from Rush's records. (A.R. at 111-115). Rush's consultant was unable to find Medicaid eligibility data for all of the patients on the IDPA list. (A.R. at 114). The Intermediary provided a position paper to the Secretary in which he asserted that the IDPA data, historically, was unreliable. (A.R. at 294). Most importantly, the Secretary points out that the IDPA list is not auditable. Indeed, it fails to list the names of the patients, and Rush itself was unable to match the listings to its own patient records.

The regulations are clear that a provider must supply financial and statistical data that are capable of verification by qualified auditors. 42 C.F. R. § 413.24. The Seventh Circuit has noted that vague evidence regarding whether residents worked in an eligible part of the hospital provided a sufficient basis for the Secretary to doubt the adequacy of the evidence. *Rush v. Leavitt*, 535 F.3d 735, at * 5-6. Like that case, the data Rush provided here simply did not enable the Secretary to determine whether the patients listed in the IDPA received services for which they should be included in the hospital's Medicaid days count. The Court shall not substitute its judgment for the Secretary's and finds that the Secretary's decision that Rush submitted inadequate data in support of 139 of the 172 claimed MedCare HMO days is supported by substantial evidence.

C.  The Atrium Pavilion

This issue merits little discussion. The parties do not dispute that Rush's depreciation account for the Atrium Pavilion contained a balance of approximately $300,000 at what should have

been the end of its depreciable life. Neither party genuinely seems to dispute that when Rush changed the method of computing its depreciation in 1984, its numbers got scrambled.[1]

As the Secretary points out, however, Rush must provide sufficient documentation to demonstrate that the costs it seeks were properly claimed for FY 1992. 42 C.F.R. 413.20; 42 C.F.R. 413.24. If the error occurred sometime in 1984, as the parties seem to agree, then Rush's attempt to claim the error in 1992 is too late. The regulations provide only a three-year window to reopen prior cost reporting periods to correct errors. 42 C.F.R. 405.1885.

Rush speculates that the error was evenly distributed throughout the final eight years of the Pavilion's depreciable life, but offers no calculations that support this speculation. Nor does Rush point to any evidentiary support that the error was evenly distributed, as opposed to attributable to a single year. Indeed, Rush's own Director of Finance admits that Rush's records are insufficient to identify the year in which the error occurred. (A.R. at 122). In the end, Rush makes a simple equitable argument, suggesting that because neither side disputes there was, in fact, an error in calculating the depreciable amount, it would be inequitable to allow the Secretary a "windfall" by denying Rush's claims.

The Court cannot ignore the plain language of the regulations that require Rush to provide documentary support for its claim for depreciation or which prohibit it from re-opening cost reporting periods more than three years past in order to adjust previously unclaimed depreciation.

---

[1] This is not to say that the entire error could be attributed to FY 1984. Neither party can point to precisely how or why the scheduled depreciation for the Atrium Pavilion became unbalanced. Nor can either party describe the effect the error had on any given fiscal year. Rush offers several theories as to the source and effect of the error, but in the end, Rush's Director of Finance testified that its records were insufficient to "individualize what year this actually took place." (A.R. at 122).

16

Because Rush points to no evidence demonstrating that it provided documentary support for its claim, the Court finds the Secretary's decision is supported by substantial evidence.

The Court finds that the Secretary's decision to disallow Rush's claim for the balance remaining on the Atrium Pavilion's depreciation schedule is not arbitrary or capricious.

IT IS SO ORDERED.

9/8/08
Dated

Hon. William J. Hibbler
United States District Court